IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

_____

JESSIE LABORIN,

             Petitioner,                    2: 08 - cv - 1998 - TJB

     vs.

KEN CLARK, Warden

              Respondent.               <u>ORDER</u>

_____

## I.  INTRODUCTION

Petitioner is a state prisoner proceeding *pro se* with an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), Petitioner consented on September 2, 2008 to have a United States Magistrate Judge conduct all further proceedings in this case.  Respondent consented on December 9, 2008.

Following a jury trial in 2005, Petitioner was convicted of second degree murder (Count I), possession of a firearm by a felon (Count II) and discharging a firearm from a motor vehicle (Count III).  The jury found the following enhancements/special circumstances with respect to Count I:  (1) that Petitioner perpetrated the second degree murder by means of shooting a firearm from a motor vehicle with the intent to inflict great bodily injury; (2) that Petitioner personally and intentionally discharged a firearm which caused great bodily injury or death; and (3) that

Petitioner personally used a firearm.  (See Clerk's Tr. at P. 309-10.)  With respect to Count III, the jury found the following enhancements:  (1) that Petitioner personally and intentionally discharged a firearm which caused great bodily injury or death; and (2) that Petitioner personally and intentionally discharged a firearm.  (See Clerk's Tr. at p. 312.)  Petitioner received a sentence of twenty years to life for his second degree murder conviction, plus a consecutive sentence of twenty-five years to life for the enhancement of intentionally discharging a firearm which caused great bodily injury or death along with a one year sentence because of a prior prison term.  Thus, Petitioner was sentenced to forty-six years to life imprisonment.[1]

In this federal habeas petition, Petitioner raises five claims; specifically:  (1) the trial court's refusal to grant a two-week continuance to permit Petitioner's expert to appear violated his constitutional and statutory rights ("Claim I"); (2) the trial court abused its discretion and violated Petitioner's state and federal constitutional rights by refusing to grant a one or two day mid-trial continuance so that a percipient defense witness could appear ("Claim II"); (3) the trial court abused its discretion and violated Petitioner's constitutional rights by refusing to grant a continuance of the hearing on Petitioner's motion for a new trial ("Claim III"); (4) the multiple conviction rule of People v. Pearson, 42 Cal. 3d 351 (1986) should apply to California Penal Code § 12022.53(d) as a lesser included offense of Petitioner's conviction for the underlying substantive charge and special circumstance and that his conviction for second degree murder along with the enhancement constituted double jeopardy ("Claim IV"); and (5) the multiple conviction rule of Pearson bars Petitioner's conviction on Count III because it is a lesser included offense of Petitioner's second degree murder conviction and that his conviction of the enhanced second degree murder conviction and Count III constituted double jeopardy ("Claim V"). Petitioner also requests an evidentiary hearing on these Claims.  For the following reasons, Petitioner's request for an evidentiary hearing and his Petition for writ of habeas corpus are

---

[1] Petitioner's other convictions/enhancements were either stayed or were to run concurrent to the sentence outlined above.

denied.

## II.  FACTUAL BACKGROUND[2]

Donna Prater loaned her bicycle to defendant.  On March 2, 2003, while driving with a friend, Tina Davido, Prater saw a teenage Black male riding a bicycle that resembled hers.  She stopped and asked the teenager about the bike.  He said he had purchased it from a "Mexican guy" for $20.

As the women continued driving, defendant, then almost 26 years old, called Prater and asked if she could pick him up and give him a ride home.  Defendant is Hispanic.  After picking up defendant, Prater drove towards defendant's home, all the while looking for the teen she had seen on the bicycle.  She wanted to see defendant's response if they encountered the teen.

In fact, they saw the teen on the bike, and Prater commented to defendant that the teen's bike looked like her bike.  Defendant acted surprised.  He tried to call the teen over, but the man rode off.  Defendant told Prater to follow the teen, saying "This nigger must have taken it off my porch."  Prater attempted to follow the teen, but she lost him.

As they continued looking, Prater came upon a couple, a young Black man and Black woman, standing in the street and arguing with each other.  The man was 16-year-old Duraey Kenneth Jones, and the woman was Natasha Powells, the mother of Jones's girlfriend.  Prater pulled over.

Defendant got out of the car and asked the couple if they had seen the teenager on the bicycle ride by.  The couple began by yelling back at him.  Powells began yelling at defendant, telling him they were in their own argument and he should go away.

As defendant attempted to ask again, Jones hit him.  Defendant swung back and missed, and Jones hit him again.  By now, more people had gathered around.  One man asked Prater and her friends to leave.  Prater apologized and explained why they were there. She also yelled at defendant to get back into the car.

Defendant, bleeding, got back in the car.  Jones continued yelling at him.  Defendant told Prater to go.  Jones walked around the front of the car and was walking around to the side and rear of the car as Prater began pulling away.  As she did, she heard three shots, and saw defendant leaning out of the passenger window.  Davido

---

[2] The factual background is taken from the California Court of Appeal, Third Appellate District opinion filed on January 3, 2008 and lodged as document four to Respondent's Answer which was filed in this Court on April 27, 2009 (hereinafter referred to as "Slip. Op.").

1
2
testified that after the shooting, defendant sat back down in the car and pointed the gun at her and Prater. Davido told Prater to "just drive right" because Prater was "swerving all over."

3
4
5
6
7
Jones died from a gunshot wound that entered his upper right back and exited his right neck. Based on black material located around the entrance wound, Dr. Mark Super, the forensic pathologist who performed an autopsy on the victim, concluded the wound was produced by a bullet that bounced off the asphalt pavement and fragmented. There were also wounds from bullet fragments to Jones' right chest and the back of his left thigh. The pathologist found no evidence of a direct hit upon Jones.

8
(Slip. Op. at p. 2-3.)

9
### III. PROCEDURAL BACKGROUND

10
Petitioner was sentenced to forty-six years to life imprisonment after a jury trial.

11
Petitioner raised the claims he includes in this federal habeas petition in the state proceedings.

12
On January 3, 2008, the California Court of Appeal affirmed the judgment.[3] The California

13
Supreme Court denied Petitioner's petition for review on April 9, 2008 without opinion.

14
Petitioner filed the instant federal habeas petition with this Court on August 18, 2008.

15
### IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

16
An application for writ of habeas corpus by a person in custody under judgment of a state

17
court can only be granted for violations of the Constitution or laws of the United States. See 28

18
U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

19
Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

20
Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

21
and Effective Death Penalty Act of 1996 ("AEDPA") applies. See Lindh v. Murphy, 521 U.S.

22
320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim

23
decided on the merits in the state court proceedings unless the state court's adjudication of the

24
claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

25
26
___
[3] The California Court of Appeal made a minor technical modification to the judgment that is not important to this Court's review of this Petition.

clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. 2254(d).

If a state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a *de novo* review of a petitioner's habeas claims. See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). Additionally, if a state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). See Larson v. Palmateer, 515 F.3d 1057, 1062 (9th Cir. 2010).

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer v. Andrande, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Id. This Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72. Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." See Williams v. Taylor, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law. See Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance

1   to circuit precedents.").

2       The first step in applying AEDPA's standards is to "identify the state court decision that

3   is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

4   When more than one court adjudicated a petitioner's claims, a federal habeas court analyzes the

5   last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  In this case,

6   the last reasoned state court opinion was from the California Court of Appeal, Third Appellate

7   District.

8   V.  PETITIONER'S CLAIMS FOR REVIEW AND REQUEST FOR AN EVIDENTIARY
           HEARING
9

10      A.      Claim I

11      In Claim I, Petitioner asserts that the trial court's denial of his request pre-trial for a

12  continuance constituted an abuse of discretion and violated his state and federal rights.  Initially,

13  to the extent that the Petitioner asserts that the denial of the continuance violated state law, that

14  claim is not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 67-68

15  (1991).  Nevertheless, Petitioner also argues that the denial of the continuance motion violated

16  his federal constitutional due process rights.  Additionally, he asserts that by denying the

17  continuance motion, the trial court denied him effective assistance of counsel because defense

18  counsel could not prepare/conduct the trial without the assistance of his expert.

19      The California Court of Appeal provided the background to Petitioner's pre-trial

20  continuance motion.  It then analyzed the Claim on the merits.   The court stated the following:

21          This case was subject to numerous extensions before it finally
            reached trial.  Trial was originally set for late January 2004, but
22          that month defendant's request to represent himself was granted
            and the trial date was vacated.  Over the next few months, trial
23          dates were set and vacated, and trial was eventually set for
            September 8, 2004.  On that date, defendant requested
24          reappointment of the public defender, and the trial date was
            vacated.  Later that month, the public defender declared a conflict,
25          and Kenneth Rosenfeld was appointed as counsel.  Rosenfeld
            represented defendant through trial.
26
            On October 21, 2004, trial was set for March 16, 2005.  On March

6

16, the trial date was vacated because Rosenfeld was in trial.  A new date was set for May 12, 2005.  On May 12, trial was moved to June 30, 2005, because counsel for both parties were in trial.  On June 30, counsel for both parties agreed to trail the matter to July 7, 2005.  The prosecutor did not oppose any of these extensions.

On July 6, 2005, the date before trial, defendant filed a motion seeking a continuance.  Defense counsel declared he had retained the services of an "expert in bullet paths" for "possible rebuttal testimony" and to have him "listen to the testimony of Dr. [Mark] Super and other witnesses."  Counsel stated the expert would be unavailable until July 26.

The matter was considered at three different hearings.  The Honorable John V. Stroud in Department 4 heard the motion first on the morning of the trial.  Defense counsel claimed the expert was a material witness to be present for cross-examination of Dr. Super and "possibly" to testify about ricochet.  Counsel stated the expert was unavailable because he had a conflicting court appearance in Colorado and a family conflict.  Counsel told the court he could not proceed without the expert.

Judge Stroud denied the motion:  "Just to come in and say he's preparing for another case, he's going to be a witness in another case is not sufficient grounds for his unavailability."  He assigned the case for trial to Department 14, the Honorable David W. Abbott.

Later that morning, defense counsel renewed his motion before Judge Abbott.  Counsel identified the expert as Larry McCormick.  McCormick, counsel claimed, was an expert in crime scene reconstruction, bullet paths and bullet trajectories, and had qualified as an expert in the Sacramento Superior Court.  McCormick was to evaluate the autopsy report, and he was to provide ballistics reconstruction, bullet trajectory, and crime scene reconstruction.  Counsel claimed Dr. Super could not provide this information.

The prosecutor opposed on numerous grounds.  The case had been continued many times, and defense counsel had assured the prosecutor "over and over and over" that he would be ready for trial, even as recently as one week before.  The prosecution had "difficult witnesses" who were ready to testify, and a family that was eager to put this matter behind them.

The prosecutor also argued the expert witness was not material.  There was no dispute that the victim was killed by bullet fragments that ricocheted.  Moreover, Dr. Super was qualified to testify as to the cause of death, the type of weapon used, and, if necessary, trajectory.  Any testimony from McCormick, the prosecutor argued, would be cumulative.

7

Defense counsel stated he had worked with McCormick for many years, and he had accepted McCormick's word that he was unavailable until July 26.  Counsel read into the record all of Dr. Super's report.  He argued it seemed unlikely that one fragmenting ricocheted bullet could hit "the anterior chest and back," and he needed McCormick to reconstruct the scene to address that issue.  "Mr. McCormick intends to be here," counsel stated, "to hear material witnesses and their testimony in order to formulate diagrams and mathematical calculations, which are far beyond the realm of my understanding or expertise."

Judge Abbott agreed with Judge Stroud and the prosecutor, and he denied the motion.  The prosecution's witnesses were ready at some expense and difficulty.  Also, it was not clear to the court that McCormick would provide testimony that would expand or clarify Dr. Super's testimony.  The court denied the motion without prejudice.  Defendant could renew it after the court had seen the evidence and defendant could demonstrate McCormick's testimony would be probative.  If at that time there was good cause to recess the trial for two or three days to allow McCormick to appear, the court would consider doing that.

Defense counsel stated he could not prepare for cross-examination without McCormick.  He asked for additional time so that Judge Stroud could reconsider his earlier denial because that court had not seen Dr. Super's report.  The court granted the request, and the parties were back before Judge Stroud before the day was out.  The court put the matter over until the following morning, and requested additional information on the expert's unavailability.

The next day, defense counsel informed the court he had spoken with McCormick and was ready to provide additional information.  Counsel had first contacted McCormick in February 2005 about the case after Dr. Super had filed an addendum to his coroner's report, and McCormick had agreed to assist defendant.  Unbeknown to counsel, McCormick had moved to Colorado in April or May to become the chief operating officer of a professional rodeo association.  Counsel had not been able to provide McCormick with a firm trial date in February, April and May because no "definite date" had been set and he had been in a long homicide trial.

Defense counsel contacted McCormick about one week before trial started, and McCormick informed him he was not available on July 7.  McCormick was busy with a major event for his rodeo association on July 15, including meetings with shareholders and the media.  On July 19, McCormick was scheduled to testify under subpoena in a court matter in Colorado.  The earliest he could appear in this matter was July 21.

Judge Stroud denied the continuance motion, stating he had not heard any new information that changed his decision of the previous day.  Defense counsel responded:  "It's a mistake on my part.  It's a mistake that I had made and I don't want [defendant] to be punished for that.  I'm willing to accept this court's contempt.  I have an attorney present with me. [¶]  But to punish [defendant] for me not checking with Larry McCormick within the last couple of months and checking on his schedule to make sure that July 7th was an absolute day, I was unaware he was the chief operating officer of the [rodeo association]."  The court reiterated its decision:  "I think your case for a continuance is worse after the information you've given me today . . . ."

Defense counsel again claimed he would not be able to do the trial and was going to ask to be relieved.  He followed through on his request to be relieved the following week, but the court denied it.  Counsel also filed in this court a petition for writ of prohibition, which we denied . . .

"Continuances shall be granted only upon a showing of good cause."  ([Cal. Penal Code] § 1050, subd. (e).)  "'The granting or denial of a continuance during trial traditionally rests with the sound discretion of the trial judge.' [Citation.]  'The burden is on [the defendant] to establish an abuse of judicial discretion . . . .' [Citation.]  '[A]n order of denial is seldom successfully attacked.' [Citation.]"  (People v. Beeler (1995) 9 Cal.4th 953, 1003.)

"'The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.  In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction. [Citations.]' [Citations.]"  (People v. Zapien (1993) 4 Cal.4th 929, 972.)

The trial court here did not abuse its discretion in denying defendant's motion for a continuance.  The record demonstrates the court considered defense counsel's diligence in securing the witness's attendance, the burden on other witnesses and the court, and the likelihood that the benefit defendant sought from the continuance would be achieved.  Sufficient evidence supports the court's weighing of these factors and concluding against defendant.

The court determined that counsel had not been diligent in securing McCormick's attendance.  Counsel himself stated that he had not kept in contact with the witness to inform him of the trial dates after first retaining him.  Trial dates changed three times between

the time counsel retained McCormick and the time he contacted McCormick to inform him of the July 7 trial date. A diligent attorney would have informed the witness each time trial was rescheduled and ascertained the witness's availability for a new date.

The court relied upon the prosecutor's representations and the record to note the impact continuing the trial would have on witnesses and the court. Trial had been continued numerous times for legitimate reasons. The prosecutor had difficulty arranging for his witnesses' attendance, but he did so in reliance on defense counsel's repeated assertions that he would be ready on July 7. Counsel could have prevented this had he maintained contact with McCormick over the course of the case's scheduling changes. Most significantly, the court concluded that McCormick's testimony would add little to the undisputed facts already at hand. There was no dispute that the bullets ricocheted and fragmented before striking the victim. Testifying as to the bullet's exact trajectory adds little to the obvious fact that the gun was not aimed directly at the victim but was nonetheless fired by defendant in a reckless and conscious disregard of life. Granting the continuance thus would have added little to the case.

Under these circumstances, we conclude the trial courts did not abuse their discretion in denying defendant's request for a two-week continuance.

(Slip. Op. at p. 5-12.)

The matter of whether to grant a trial continuance is traditionally within the discretion of the trial judge. See Avery v. Alabama, 308 U.S. 444, 446 (1940). "[I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Ungar v. Safafite, 376 U.S. 575, 589 (1964). Whether a denial of a continuance deprives a defendant due process "must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied." Id. at 589; see also Morris v. Slappy, 461 U.S. 1, 11-12 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence' upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.") (citation omitted).

There is no specific test to decide when denial of a continuance is so arbitrary as to

1   violate due process.   See Ungar, 376 U.S. at 589.   The United States Court of Appeals for the

2   Ninth Circuit has enunciated four factors that a court should examine in determining whether a

3   trial court unreasonably denied a criminal defendant's motion to continue; specifically:  (1) the

4   appellant's diligence in preparing his case; (2) the likelihood that the continuance would serve a

5   useful purpose; (3) whether the continuance would inconvenience the parties, the court, or other

6   witnesses, and (4) whether the appellant was prejudiced by the district court's refusal to grant the

7   request for a continuance.   See United States v. Rivera-Guerrero, 426 F.3d 1130, 1138-39 (9th

8   Cir. 2005); see also United States v. Flynt, 756 F.2d 1352, 1359 (9th Cir. 1985).   Both Petitioner

9   and Respondent agree that these are the relevant factors to consider in this federal habeas

10  petition.[4]  (Compare Pet'r's Pet. at p. 35-36 with Resp't's Answer at p. 10.)   The Ninth Circuit

11  has applied these factors in determining the arbitrariness of the denial of a continuance motion on

12  federal habeas review.   See Armant v. Marquez, 772 F.3d 552, 556-57 (9th Cir. 1985) (applying

13  the four-factor test outlined in Flynt to determine whether a petitioner is entitled to federal habeas

14  relief on his claim that the denial of his continuance motion violated his constitutional rights).

15          Initially, Petitioner did not show diligence in securing the expert witness' testimony.

16  Even though the expert witness was not under subpoena, trial counsel was clearly not in regular

17  contact with the witness.   The California Court of Appeal specifically noted that "a diligent

18  attorney would have informed the witness each time trial was rescheduled and ascertained the

19

20          [4] As noted previously, in addition to raising a due process argument, Petitioner also
    argues that the denial of the continuance implicated his Sixth Amendment right to counsel
21  because counsel could not be effective without the expert present at trial.  (See Pet'r's Pet. at p.
    37.)  The Ninth Circuit has stated that where a request for a continuance implicates a defendant's
22  right to counsel, the court uses a five factor test; specifically: (1) whether the continuance would
    inconvenience the witnesses, the court, counsel, or the parties; (2) whether other continuances
23  have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the
    defendant's fault; and (5) whether a denial would prejudice the defendant.  See United States v.
24  Studley, 782 F.2d 934, 938 (9th Cir. 1986); see also United States v. Robinson, 967 F.2d 287,
    291 (9th Cir. 1992).  However, the Ninth Circuit has specifically stated that the factors outlined
25  in Flynt as compared to Strudley and Robinson are not very different.  See United States v.
    Mejia, 68 F.3d 309, 314 n.5 (9th Cir. 1995).  Furthermore, the application of this set of factors
26  would not change the result in this case for the reasons described infra.

witness's availability for the new date." (Slip. Op. at p. 12.)  In light of the several trial dates and subsequent continuances for trial, it is apparent that trial counsel was not diligent in securing this witnesses' appearance at trial.  Otherwise, he would have at least known that the witness had moved to Colorado to take a position as COO of a professional rodeo association.[5]

The next factor to consider is the likelihood that the continuance would serve a useful purpose.  In this case, Petitioner did not dispute that he fired the gun.  His argument was that he did not aim and shoot at the victim, but rather fired the gun to scare the victim away from the car.  (See Pet'r's Pet. at p. 43.)  Petitioner argues that while Dr. Super testified that he was an expert in bullet paths through the body, he was not an expert as to where the bullet started from or crime scene reconstruction.  (See Reporter's Tr. at p. 279.)  Defense counsel proffered that McCormick was an expert in crime scene reconstruction.  Defense counsel also stated that he wanted McCormick at trial so that he could properly cross-examine Dr. Super and possibly present McCormick as a rebuttal witness.  However, defense counsel elucidated from Dr. Super on cross-examination that the bullets that struck the victim were ricochets off of the pavement in his opinion.  Thus, it seems that Petitioner's trial counsel was able to properly cross-examine Dr. Super without the need for McCormick's presence at trial.  Nevertheless, in light of Petitioner's trial counsel's proffer, the continuance would have presumably served some useful purpose for Petitioner.

The third factor to consider is whether the continuance would have inconvenienced the parties, the court or other witnesses.  Defense counsel requested a two-week continuance.  At

---

[5] In his traverse, Petitioner alludes to an ineffective assistance of counsel claim for his trial counsel's failure to be diligent in securing his expert witness's testimony at trial. (See Pet'r's Traverse at p. 6 ("[T]he question is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on having produced a just result.").)  However, this Court declines to address this purported new claim (to the extent Petitioner is in fact raising it in his traverse) because it was not raised by the Petitioner in his opening brief.  See Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("A traverse is not the proper pleading to raise additional grounds for relief.").

1   trial, the prosecutor called eight witnesses.  During oral argument on the continuance motion, the

2   prosecutor indicated specifically that he had several "difficult witnesses that are now lined up and

3   ready to go." (Reporter's Tr. at p. 10.)  In light of this representation by the prosecutor, it appears

4   as if the continuance would have been inconvenient to the prosecutor and other witnesses.

5           Finally, in order for habeas relief to be warranted, a petitioner must show actual prejudice

6   to his defense resulting from the trial court's improper refusal to grant a continuance.  See

7   Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).  The Ninth Circuit has stated that the

8   issue of prejudice is a "critical question."  See Mejia, 69 F.3d at 316 (explaining that "[t]he most

9   critical question is whether Mejia was prejudiced by the district court's refusal to grant his

10  request for a continuance.  We may not reverse unless the party whose request was denied

11  suffered prejudice.") (citations omitted); see also Armant, 772 F.2d at 556-57 (explaining that "at

12  a minimum" a habeas petitioner must show prejudice to succeed on this claim regarding the

13  denial of a continuance).  In Mejia, the Ninth Circuit stated that "[w]here the denial of a

14  continuance prevents the introduction of specific evidence, the prejudice inquiry focuses on the

15  significance of that evidence." 69 F.3d at 317.  Petitioner argues that "[t]he proffered testimony

16  [of Petitioner's expert] would have been critical to his defense that he lacked intent to shoot the

17  victim because he aimed and fired the gun into the ground." (Pet'r's Pet. at p. 9.)  Petitioner

18  sought to have his expert testify that the gun was fired into the ground.  However, as noted by the

19  California Court of Appeal, "[t]here was no dispute that the bullets ricocheted and fragmented

20  before striking the victim." (Slip. Op. at p. 12.)  Furthermore, Petitioner's trial counsel

21  elucidated from Dr. Super on cross-examination his opinion that the bullets bounced off of the

22  pavement.   Specifically the colloquy was as follows:

23                  [Petitioner's Trial Counsel]:  In the examination of the victim's
                    body, there were no whole bullets; is that correct?
24                  [Dr. Super]:  There were no bullets at all found.
                    [Petitioner's Trial Counsel]:  The bullet fragments that were found,
25                  what a fragment means is it's part of a bullet?
                    [Dr. Super]:  Yes, and these were fairly small fragments.
26                  [Petitioner's Trial Counsel]:  And you found black material which

you opined to be asphalt on one of the fragments?
[Dr. Super]: No, the black material was on the skin around the entrance wound of the main perforating gunshots.
[Petitioner's Trial Counsel]: *Is it your opinion one of the fragments possibly bounced off the asphalt and went inside the body?*
[Dr. Super]: *That would be my opinion that a bullet bounced off the pavement, was deformed because it bounced off the pavement, then struck him going through his body.*
[Petitioner's Trial Counsel]:  And what deforms means that means it becomes fragments; right?
[Dr. Super]:  Well, that, but more importantly it changes its shape because now it's hit something so now it's probably flattened and at least partially flat, and in that flattening process, small fragments could come off.
[Petitioner's Trial Counsel]:  I'm a lay person, so certainly not a medical examiner.  *You didn't find any evidence of a direct hit on Mr. Duraey, did you?*
[Dr. Super]: *No, I did not.*

(Reporter's Tr. at p. 291-92 (emphasis added).)  As the above passage illustrates, the trial

testimony indicated that the shots that killed the victim were ricochets off of the pavement.  The

fact that McCormick may have testified that the gun was aimed at the ground was already

supported by Dr. Super's testimony that the bullets that struck the victim were ricochets off of

the pavement.

Petitioner did not suffer prejudice when the trial court denied his motion for a

continuance.  The evidence would have been cumulative in light of Dr. Super's testimony.

While McCormick's presence at trial might have had some useful purpose to Petitioner, in light

of the other factors, and most importantly the lack of prejudice suffered by the Petitioner for the

denial of the pre-trial continuance request, Petitioner is not entitled to federal habeas relief on

Claim I.

B.	Claim II

In Claim II, Petitioner asserts that his state and federal constitutional rights were violated

when the trial court denied a one to two-day mid-trial continuance request so that Petitioner

could call Alca Hannon as a witness.  Petitioner's trial counsel proffer was that Mr. Hannon

"would testify that the gun fired by Mr. Laborin was aimed at the ground at the time of firing,

14

and that during the fight, Mr. Laborin put his hands up and said I don't want to fight anymore, and was continued to be pursued by Mr. Jones." (Reporter's Tr. at p. 354.)  As with Claim I, to the extent that the Petitioner asserts that the denial of this continuance violated state law, that claim is not cognizable on federal habeas review.  See Estelle, 502 U.S. at 67-68.

The California Court of Appeal provided the background to this continuance motion and then analyzed this Claim on the merits.  The court stated the following:

> The prosecution rested its case on Wednesday, July 13, 2005.  The court asked defense counsel how many witnesses he planned to present, and counsel stated he was trying to find one who moved since last contacted.  The trial court indicated it would spend part of the following day, Thursday, reviewing jury instructions, and be dark on Friday.  The court informed defense counsel he would not have to rest his case on Thursday, and would have until Monday to locate the missing witness.

> On Monday, the witness, Alca Hannon, did not appear.  Defense counsel stated Hannon moved from Sacramento to Oakland with little forwarding information.  Counsel obtained a current phone number for the witness's grandfather.  Counsel spoke with Hannon the previous week and asked for his address.  Hannon gave him an incorrect address.  Counsel obtained Hannon's grandfather's address using a reverse directory.

> The process server went to Oakland the preceding Friday and confirmed with the grandfather that Hannon lived there.  Over the weekend, the process server attempted to serve the witness at least five more times, but the witness was never home.  The grandfather continued to say Hannon would be back later.

> Counsel stated that Hannon was reluctant to appear in court for fear of retribution.  Counsel also stated that if Hannon were to testify, he would claim that defendant aimed the gun at the ground when he fired it, put his hands up and said he did not want to fight anymore, and was pursued by the victim after the fight.  Counsel asked for a warrant to be issued, and for a continuance to have Hannon appear in court.

> The prosecutor opposed the request.  He argued there was no basis for a warrant because the witness had not been served.  He also argued against a continuance, claiming attempts to serve Hannon began only a few days previously.  "I can't see that being a basis for a continuance at this stage of the trial when the trial date has been known for a long time."

> Defense counsel retorted that he had done enough to satisfy the

15

requirements of due diligence: "It wasn't as if we've known where he lived for the last three years and just decided a few days ago to find him."

The trial court denied the request for a warrant and a continuance. It could not issue a warrant because Hannon had not been served. It also would not delay the case further at this stage of the proceedings to allow counsel more time to serve Hannon.  "I realize you have had difficulty in locating him," the court stated, "but I don't have any assurances that he is going to be served or secured, and therefore, any continuance and any further delay is somewhat uncertain in terms of the time that would be consumed with that entire process.  [¶]  We are at virtually the end of this trial, and therefore, I am not going to continue this case to allow you additional time to try to secure Mr. Hannon's presence." Defense counsel stated he knew where Hannon lived, and it would take only one or two days to serve him.  The court was not persuaded, noting counsel had been attempting service since the past Thursday, and Hannon did not want to be found.  "He's evading service.  And I don't have any assurance that you're going to get him with a subpoena, even if I gave you another two days." . . . .

As with the earlier request, we find no abuse of discretion. Despite defense counsel's efforts, there was no assurance a continuance would guarantee Hannon would be served.  The court gave counsel additional time to attempt service even after the defense finished presenting its case.  Counsel admits he attempted to serve Hannon seven times during that additional time period, all to no avail.  Defendant was entitled to a reasonable time to serve Hannon, but the court had already provided that time.  It did not abuse its discretion by refusing to continue providing defendant even more additional time to serve a witness successfully avoiding service when the trial was otherwise complete.  There was no benefit to Hannon's testimony if he could not be brought to court. Moreover, Hannon's testimony would have been cumulative. According to defense counsel, Hannon would testify that defendant aimed his gun at the ground when he fired it.  This point was not in dispute.  Defendant thus suffered no prejudice by not having Hannon testify.  The trial court did not abuse its discretion when it denied defendant's request for this continuance.

(Slip. Op. at p. 13-16.)

As noted in supra Part V.A, the factors used to determine whether a trial court unreasonably denied a criminal defendant's motion to continue are:  (1) the appellant's diligence in preparing his case; (2) the likelihood that the continuance would serve a useful purpose; (3) whether the continuance would inconvenience the parties, the court, or other witnesses, and (4)

whether the appellant was prejudiced by the district court's refusal to grant the request for a

continuance.  See Rivera-Guerrero, 426 F.3d at 1138-39; see also Armant, 772 F.2d at 556-57;

Flynt, 756 F.2d at 1359.

First, Petitioner did show diligence in attempting to serve Mr. Hannon on several

occasions during a four-day period.

Next, it was at best unclear whether there was a likelihood that the continuance would

have served a useful purpose.  The trial court gave Petitioner four days to serve Mr. Hannon to no

avail.  During this time, Petitioner tried to serve Mr. Hannon several times.  There was no

likelihood that a continuance of one or two more days would have been useful to Petitioner.

Simply put, after four days and several failed attempts, there was no guarantee that Mr. Hannon

would ever be served.  Indeed, as the California Court of Appeal noted, it appeared as if Mr.

Hannon was avoiding service.

Third, there would have been at least some inconvenience to the court/jury as the request

for this continuance occurred mid-trial.

Finally, regarding the most important factor, prejudice, there was no guarantee that the

continuance would have led to Mr. Hannon's testimony at trial.  As noted above, it appeared that

he was purposefully avoiding service.  Additionally, and perhaps most importantly, Petitioner's

trial counsel's proffer that Mr. Hannon would testify that Petitioner aimed his gun at the ground

was already supported at trial by Dr. Super's testimony that bullet fragments killed the victim and

his opinion that the bullets were ricochets off of the pavement.  (See Reporter's Tr. at p. 291.)

Thus, Mr. Hannon's purported testimony that the gun was pointed at the ground would not have

added much to Petitioner's case.  The trial testimony already indicated that the bullets that struck

the victim had bounced off of the ground.

Mr. Hannon's other testimony as cited by defense counsel would have also been

cumulative.  Trial counsel stated that Mr. Hannon would have testified that Petitioner did not

want to fight and that the victim pursued Petitioner.  However, there was already ample evidence

17

1  in the record for the jury to consider which supported his purported testimony.  For example,

2  Donna Prater testified that the victim "walked along the front of the car and along the side of it

3  when we were pulling away" and as Petitioner was getting into the car, the victim was "coming

4  around the side as [Prater is] pulling away."  (Id. at p. 137, 138.)  Additionally, on cross-

5  examination, Ms. Prater stated that the victim was coming around to the front of the car to work

6  his way around to where Petitioner was getting in.  (See id. at p. 147.)  Tina Davido testified that

7  the Petitioner did not throw one punch towards the victim and was in a surrender type pose

8  telling the victim to "hold on, hold on, hold on."  (Id. at p. 170.)

9       In light of the testimony already in the record, Petitioner failed to show that he was

10  prejudiced by the denial of the mid-trial continuance request.  For that reason, as well as the lack

11  of any guarantee that the continuance would produce Mr. Hannon at trial, Petitioner is not

12  entitled to federal habeas relief on Claim II.

13       C.     Claim III

14       In Claim III, Petitioner asserts that his constitutional rights were violated when the trial

15  court denied his request to continue the hearing on Petitioner's motion for a new trial.

16  Specifically, Petitioner argues that, "[t]he refusal denied the defense an opportunity to include

17  potentially critical material evidence about the prejudice created by the trial court's denial of a

18  continuance so that McCormick could appear." (Pet'r's Pet. at p. 61.)  Initially, as with Claims I

19  and II, to the extent that the Petitioner asserts that the denial of this continuance violated state

20  law, that claim is not cognizable on federal habeas review.  See Estelle, 502 U.S. 67-68.

21       The California Court of Appeal provided the background to this continuance motion and

22  then analyzed the Claim on the merits.  The court stated the following:

> The jury returned its verdicts on July 19, 2005.  The court delayed
> sentencing until September 21 to allow for new counsel to prepare
> a motion for new trial, and it appointed counsel from the conflict
> panel.
>
> On August 16, attorneys Jeffrey Rosenblum and Victor Haltom
> substituted in as counsel of record for defendant.

On September 21, the court stated it understood the transcripts would be ready by October 7 and that defense counsel wanted additional time.  The court scheduled the matter for a status conference on October 28.

At the October 28 status conference, defense counsel Haltom stated he had received most of the transcript two weeks earlier, and expected to receive the remaining 40 pages that day.  He anticipated retaining one or two experts in ballistics and pathology, as well as an investigator to conduct at least one out-of-state interview.  He also asked for copies of transcripts of sealed hearings taken during the trial.  He anticipated having a motion for new trial ready to file in six weeks, and asked the court for that much time.

The court gave defense counsel five weeks, until December 1, to file his motion, and it scheduled a hearing on the motion for December 16.  Although the time granted for briefing was one week less than requested, defense counsel stated he would comply with the court's order.

On November 28, however, defense counsel filed a motion to continue the briefing schedule and the hearing date.  Counsel was assessing whether defendant's constitutional rights were compromised by either the trial court's denial of trial counsel's request for a continuance to secure McCormick's attendance, or trial counsel's ineffective performance at trial or in failing to have McCormick under subpoena.

Since the October 28 status conference, defense counsel had completed his review of the trial record, and, as of November 15, had retained a new ballistics expert, George Luczy.  Luczy needed additional time and material to assess the case, including any materials McCormick had prepared for the case.  Counsel had spoken with McCormick on November 21, but McCormick was leaving on a three-week business trip and could not review his file until his return.  Counsel had not heard back from McCormick.  However, counsel indicated that Luczy was "certain" that the fatal wound that struck the victim was a ricochet shot.

The trial court denied the request to continue the hearing, but it granted defendant counsel an additional eight days, until December 9, to complete his investigation and file his papers.

Defendant filed his motion for a new trial on December 9.  One of his grounds was that he was denied a fair trial due either to the court's denials of his request for a continuance to allow McCormick to participate, or to trial counsel's ineffectiveness.  Defense counsel stated he was working with Luczy to obtain his opinion on the bullet's paths and points of origin, and he hoped that Luczy's testimony would be available at the hearing on the

motion.

Defense counsel then argued the relevance of that testimony: "If a ballistics expert is able to establish the distance between [defendant] and [the victim] at the time of the shooting, and if that distance is demonstrated to be relatively brief, such evidence would militate in favor of [defendant's] defense on both the heat of passion and imperfect self-defense fronts.

"If the ballistics expert is able to determine the angle at which [defendant's] gun was pointed at the time of the shooting, such evidence could be germane to the level of recklessness of [defendant's] conduct, *viz.*, whether his conduct involved conscious disregard for the safety and life of [the victim]."
At the hearing on the motion, however, Luczy did not appear. Defense counsel acknowledged "that we don't have a showing of prejudice . . . we have not completed our investigation.  We've consulted with our ballistics expert.  I talked to him yesterday and the last communication from him to me was, look, I need additional time.  I need to do further investigation."

Defense counsel Rosenblum explained his contacts with McCormick.  He had contacted McCormick about four weeks earlier.  McCormick was leaving on business for three weeks.  He had been unable to find a file on this case, and he could not recall whether he performed any investigation on it.  Trial counsel tried to contact McCormick during the ensuing three weeks but was unsuccessful.  Counsel reached McCormick upon the latter's return to Colorado, but McCormick's stepmother had just passed away and he was unable to talk.  Defendant thus was unable to pursue any investigation with McCormick.

The prosecutor emphasized that the court had before it only speculation of what an expert might say, and even if that speculation were true, it would not change the verdict.  "If you just guess what a defense expert might say, it's not going to erase the fact that this defendant shot multiple times towards the victim as he was driving away in his car.  Now that's implied malice and that's what the jury found . . . ."

The trial court agreed with the prosecutor and denied the motion for a new trial.  As to prejudice from the court's original refusal to continue trial to enable the defense to have McCormick in court, the court concluded that defendant still had not made an adequate showing of good cause that would have justified continuing the trial for McCormick to participate.

As to the argument of inadequacy of counsel, the court stated that the most favorable opinion an expert could render would not have changed the verdict.  There was no dispute that the bullet ricocheted.  "[I]mplied malice can still be found by the jury and

under the total circumstances of the case likely would have [been] found." . . .

The court did not abuse its discretion denying defendant's request to continue the hearing on the motion for a new trial. As already mentioned, to grant a continuance, the court must weigh, among other factors, the benefit the moving party anticipates from the continuance and the likelihood that the benefit will result. (People v. Zapien, supra 4 Cal.4th at p. 972.) The trial court clearly weighed that factor and determined defendant would not benefit from a continuance. No ballistics expert was needed to show that defendant did not aim the gun directly at the victim, nor could a ballistics expert disprove that defendant fired the gun multiple times with conscious disregard for the victim's safety.

The undisputed facts demonstrated the existence of implied malice, an element of second degree murder. "[M]alice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers life of another and who acts with conscious disregard for life' [citation]." (People v. Blakely (2000) 23 Cal.4th 82, 87.) The Supreme Court describes this mental state as a "'conscious disregard for life.'" (Ibid.) No expert testimony was likely to overcome the prosecution's evidence of implied malice in this case.

Defendant argues that his attorneys were diligent in attempting to retain Luczy, the new expert, in preparation for the new trial motion. Even if that is so, it does not overcome the futility of seeking the expert in the first place. Recognizing that point, the trial court was well within its discretion to deny the request for a continuance on the new trial motion.

(Slip. Op. at p. 16-21 (internal citations omitted).)

In his federal habeas petition, Petitioner asserts that the motion for a continuance would have allowed his newly retained ballistics expert to complete his findings. Thus, he argues that the trial court violated his constitutional rights by denying the motion. However, similar to the discussion in supra Part V.A., even if the motion to continue was granted to allow the new ballistics expert to complete his findings, Petitioner was not prejudiced. Petitioner's argument is that his expert would show that he lacked the requisite mental state to commit murder.

The evidence of the mental state required to convict Petitioner of second degree murder (i.e. implied malice) was strong. Furthermore, as previously mentioned, the pathologist (Dr.

21

Super) testified at trial his opinion the bullet ricocheted off of the pavement.  Any further expert

report regarding the paths of the bullets would have presumably been cumulative of Dr. Super's

testimony.  Because Petitioner has not shown that he was prejudiced by the trial court's refusal to

continue the motion for a new trial, he is not entitled to habeas relief on this Claim.

       D.     Claim IV

       In Claim IV, Petitioner first contends that the imposition of his twenty-five years to life

sentence for the weapons enhancement sentence under California Penal Code § 12022.53(d)[6]

violates California's multiple conviction rule and California Penal Code § 654[7] as a lesser

included offense of appellant's conviction for second degree murder.

       Once again, to the extent that Petitioner alleges that the imposition of the enhancement

violated state law, that claim is not cognizable on federal habeas review.  Furthermore,

Petitioner's argument that the state courts misapplied California Penal Code § 654 is not

cognizable on federal habeas review.  See Watts v. Bonnerville, 879 F.3d 685, 687 (9th Cir.

1989) (refusing to consider a claim in a federal habeas petition which argued that the state court

misapplied § 654 as it was non-cognizable on federal habeas review).  Additionally, it is worth

---

[6] California Penal Code § 12022.53(d) states:

> Notwithstanding any other provision of law, any person who, in the
> commission of a felony specified in subdivision (a), Section 246,
> or subdivision (c) or (d) of Section 12034, personally and
> intentionally discharges a firearm and proximately causes great
> bodily injury, as defined in Section 12022.7, or death, to any
> person other than an accomplice shall be punished by an additional
> and consecutive term of imprisonment in the state prison for 25
> years to life.

[7] California Penal Code § 654 states that:

> An act or omission that is punishable in different ways by different
> provisions of law shall be punished under the provision that
> provides for the largest potential term of imprisonment, but in no
> case shall the act or omission be punishable under more than one
> provision.

noting that the California Supreme Court has rejected Petitioner's argument in <u>People v. Sloan</u>, 42 Cal. 4th 110, 113-14, 64 Cal. Rptr. 3d 137, 164 P.3d 568 (2007) and <u>People v. Izaguirre</u>, 42 Cal. 4th 126, 128-29, 64 Cal. Rptr. 3d 148, 164 P.3d 578 (2007) as stated by the California Court of Appeal in this case.  That court, in citing to the two cases cited above explained that the enhancements are not legal elements of the offense to which they attach.  (<u>See</u> Slip. Op. at p. 22-23.)

In addition to making state law arguments, Petitioner also argues that his sentence for second degree murder and the weapons enhancement in Count I violated the Double Jeopardy Clause of the United States Constitution.  The Double Jeopardy Clause contains three distinct constitutional protections.  <u>See</u> <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1204 (9th Cir. 2006).  "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishment for the same offense."  <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717 (1969) (footnotes omitted); <u>see</u> <u>also</u> <u>Brown v. Ohio</u>, 432 U.S. 161, 165 (1977).

In <u>Plascencia</u>, 467 F.3d at 1204, the Ninth Circuit analyzed whether a petitioner's sentence for murder in addition to a twenty-five years to life enhancement for using a firearm constituted double jeopardy.  The Ninth Circuit explained that the United States Supreme Court in <u>Missouri v. Hunter</u>, 459 U.S. 359, 366 (1983):

> made clear that the protection against multiple punishments for the same offense did not necessarily preclude cumulative punishments in a single prosecution.  The key to determining whether multiple charges and punishments violate double jeopardy is legislative intent.  When the legislature intends to impose multiple punishments, double jeopardy is not invoked.

<u>Plascencia</u>, 467 F.3d at 1204.  The Ninth Circuit continued by stating that the language of § 12022.53 is clear and that the there is no question that the California legislature "simply determined that a criminal offender may receive additional punishment for any single crime

1   committed with a firearm." Id.  In Plascencia, the Ninth Circuit rejected Petitioner' double

2   jeopardy argument.  See id.  Plascencia involved a similar issue that Petitioner raises in this

3   federal habeas petition.  Accordingly, Petitioner is not entitled to federal habeas relief on this

4   Claim.

5        Petitioner also invokes Apprendi v. New Jersey, 530 U.S. 466 (2000) in support of this

6   Claim by arguing that his due process rights were violated.  Apprendi held that any fact, other

7   than a prior conviction, that increases the penalty for a crime beyond the statutorily prescribed

8   term must be submitted to the jury and proven beyond a reasonable doubt.  530 U.S. at 489.

9   Apprendi is not implicated in this Petition because the jury found the § 12022.53 enhancement to

10  be true beyond a reasonable doubt and the trial court did not impose punishments in excess of

11  those prescribed by statute.  (See Reporter's Tr. at p. 448.)  In light of the fact that there was no

12  double jeopardy issue and Apprendi was not implicated, Petitioner is not entitled to habeas relief

13  on Claim IV.

14      E.    Claim V

15       Finally, in Claim V, Petitioner asserts that "[t]he same reasoning outlined in [Claim IV],

16  applies to [his] conviction in count 3, intentionally discharging a firearm from a motor vehicle

17  The constitutional prohibition against double jeopardy protects a defendant from more than one

18  conviction for the same offense."  (Pet'r's Pet. at p. 78.)  He asserts that the legal elements for his

19  conviction under California Penal Code § 12034(c)[8] are the same for his conviction for second

20  degree murder with the jury finding of a special circumstance enhancement under California

21

22

23                               

24         [8] California Penal Code § 12034(c) states:

25             Any person who willfully and discharges a firearm from a motor
    vehicle at another person other than an occupant of a motor vehicle
26             is guilty of a felony punishable by imprisonment in state prison for
    three, five, or seven years.

Penal Code § 190(d).[9]

The Double Jeopardy Clause "serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." See Brown v. Ohio, 432 U.S. 161, 164 (1977). "[T]he established test for determining whether two offenses are sufficiently distinguishable to permit the imposition" of multiple punishments is "'whether each provision requires proof of an additional fact which the other does not.'" Id. (quoting Blockburger v. United States, 84 U.S. 299, 304 (1932)).

In California, "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." People v. Knoller, 41 Cal. 4th 139, 151, 59 Cal. Rptr. 3d 157, 158 P.3d 731 (2007). Malice can be either express or implied. "It is express when there is manifested a deliberate intention to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart" Id. Shooting at a person from a vehicle in violation of California Penal Code § 12034(c) "requires that the perpetrator shoot from inside a vehicle 'at' someone who is not inside the vehicle, and to do so willfully and maliciously." People v. Licas, 41 Cal. 4th 362, 369, 60 Cal. Rptr. 3d 31, 159 P.3d 507 (1997). A violation of § 12034 requires proof of several facts distinct from those required for second degree murder, including shooting a firearm and being inside a motor vehicle. Second

---

[9] California Penal Code § 190(d) states:

> Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury.

degree murder requires an "unlawful killing" whereas a violation of § 12034 does not. Accordingly, Petitioner's rights under the Double Jeopardy Clause were not violated by his conviction for these two offenses.

Petitioner's double jeopardy argument also fails for the reasons espoused in Part V.D.  As noted previously, "[t]he key to determining whether multiple charges and punishments violate double jeopardy is legislative intent.  When the legislature intends to impose multiple punishments, double jeopardy is not invoked.  See Plascencia, 467 F.3d at 1204 (citing Hunter, 459 U.S. at 368-69).  The California Legislature separately defined the offenses for which Petitioner was convicted, separately prescribed an enhancement under the second degree murder conviction under California Penal Code § 190(d) "and made clear that a person may be convicted of more than one crime arising out of the same act or course of conduct in a unitary criminal proceeding." Sloan, 42 Cal. 4th at 121, 64 Cal. Rptr. 3d 137, 164 P.3d 568 (citing Cal. Penal Code § 954).  Petitioner made clear that Claim V attempts to apply "the same reasoning as outlined in [Claim] IV." (Pet'r's Pet. at p. 78.)  For the reasons outlined above, Petitioner's convictions did not constitute double jeopardy.[10]

F.      Request for an Evidentiary Hearing

Finally, Petitioner requests an evidentiary hearing.  Pursuant to 28 U.S.C. § 2254(e)(2), a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." Earp, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is

---

[10] Furthermore, as with Claim IV, the jury made specific findings with respect to the enhancements complained of by Petitioner so as to remove any Apprendi type issue to the extent it is raised in Claim V.

1   "required to allege specific facts which, if true, would entitle him to relief." Ortiz v. Stewart, 149

2   F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).

3          In this case, an evidentiary hearing is not warranted.  Petitioner failed to demonstrate that

4   he has a colorable claim for federal habeas relief for the reasons stated in Parts V.A-E.

5                                          VI.  CONCLUSION

6          For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief or

7   an evidentiary hearing.  Should petitioner wish to appeal to appeal the court's decision, a

8   certificate of appealability must issue.  28 U.S.C. § 2253(c)(1); Hayward v. Marshall, 603 F.3d

9   546, 554 (9th Cir. 2010) (en banc).  A certificate of appealability may issue where "the applicant

10  has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

11  The certificate of appealability must "indicate which specific issue or issues satisfy" the

12  requirement.  28 U.S.C. § 2253(c)(3).

13         A certificate of appealability should be granted for any issue that petitioner can

14  demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

15  court, or is "'adequate to deserve encouragement to proceed further.'"  Jennings v. Woodford,

16  290 F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).[11]

17  In this case, however, petitioner failed to make a substantial showing of the denial of a

18  constitutional right with respect to any issue presented.

19         Accordingly, IT IS HEREBY ORDERED that:

20         1.     Petitioner's request for an evidentiary hearing is DENIED;

21         2.     Petitioner's Petition for writ of habeas corpus is DENIED; and

22         3.     A certificate of appealability shall not issue.

23  //

24

25         [11]  Except for the requirement that appealable issues be specifically identified, the
    standard for issuance of a certificate of appealability is the same as the standard that applied to
26  issuance of a certificate of probable cause.  See Jennings, 290 F.3d at 1010.

                                                  27

DATED:  September 30, 2010

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE